UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | |
|---|---|
| JOE HAND PROMOTIONS, INC.,<br><br>Plaintiff,<br><br>- vs -<br><br>MELISSA H. MCGEHEE,<br>a/k/a MELISSA HERNANDEZ,<br>d/b/a MONA'S, and<br>KENNEY J. MCGEHEE,<br>a/k/a KENNY J. MCGEHEE,<br>d/b/a MONA'S,<br><br>Defendants. | CASE NO.: 7:17-cv-00133-RAJ-DC |

**PLAINTIFF, JOE HAND PROMOTIONS, INC.'S MOTION FOR FINAL DEFAULT
JUDGMENT AND SUPPORTING BRIEF**

Plaintiff, JOE HAND PROMOTIONS, INC., by and through its attorney, files this its Motion for Final Default Judgment against Defendants, (1) MELISSA H. MCGEHEE, a/k/a MELISSA HERNANDEZ, d/b/a MONA'S and (2) KENNEY J. MCGEHEE, a/k/a KENNY J. MCGEHEE, d/b/a MONA'S, and Supporting Brief ("Motion"), which is supported by the following brief.

**A.  NATURE AND STAGE OF THE PROCEEDING**

1.      On June 29, 2017, Plaintiff, Joe Hand Promotions, Inc. (hereinafter "Plaintiff" or "JHP") filed its Complaint [*See* Doc. No. 1] against Defendants, (1) MELISSA H. MCGEHEE, a/k/a MELISSA HERNANDEZ, d/b/a MONA'S and (2) KENNEY J. MCGEHEE, a/k/a KENNY J. MCGEHEE, d/b/a MONA'S, complaining of Defendants' unauthorized and illegal interception or receipt and exhibition of the broadcast of (1) *Ultimate Fighting Championship® 193: Rousey*

1

*vs. Holm*, including all undercard bouts and the entire television broadcast, scheduled for November 14, 2015 (hereinafter the "UFC Program") and the broadcast of (2) *Miguel Cotto vs. Canelo Alvarez*, including all undercard bouts and the entire television broadcast, scheduled for November 21, 2015 (hereinafter the "Boxing Program") at Mona's located at 318 North Hancock Avenue, Odessa, Texas (hereinafter "Establishment"), a commercial business, without paying the sublicense fees to Plaintiff. The UFC Program and the Boxing Program shall be referred to collectively as the "Programs".

2. On Order for Clerk's Entry of Default [*See* Doc. No. 14], default was entered against Defendants, MELISSA H. MCGEHEE and KENNEY J. MCGEHEE on November 8, 2017 (hereinafter referred to as "Defendants"). *See* Doc. No. 15.

3. JHP hereby seeks the entry of a final default judgment against Defendants for statutory damages under the Federal Communications Act of 1934, as amended.

### B. STATEMENT OF THE ISSUES AND SUMMARY OF THE ARGUMENT

4. This is an "Anti-Piracy" case under the Federal Communications Act of 1934, as amended (the "Communications Act"). The Communications Act protects against the piracy of radio and television signals. *See* 47 U.S.C. §§ 553[1] and 605.[2]

---

[1] 47 U.S.C. § 553 provides, *inter alia*, that:
No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

[2] 47 U.S.C. § 605 provides, *inter alia*, that:
No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

5. "In general, 'piracy' refers to the decoding or decryption of scrambled programming without the authorization of the programmer nor payment for the programming." *U.S. v. Scott*, 783 F. Supp. 280, 281 (N.D. Miss. 1992)(reviewing the legislative history of § 605(e)(4)).

6. By virtue of the default, Defendants have admitted to committing piracy against Plaintiff.

7. The well plead facts in Plaintiff's Complaint that Defendants illegally intercepted or received the close-circuit telecasts of the Programs and exhibited the Programs in Defendants' Establishment willfully and with the purpose and intent to secure a commercial advantage and private financial gain without authorization or payment to Plaintiff are admitted. *See* Doc. No. 1. Therefore, liability has been established as a matter of law by default.

8. In this Motion, Plaintiff seeks statutory damages under 47 U.S.C. § 605, including interest, costs, and attorney's fees as is more fully shown herein.

### C. UNDISPUTED EVIDENCE

9. In addition to the admissions in Plaintiff's Complaint [*See* Doc. No. 1], Plaintiff provides the following evidence to support a Final Default Judgment against Defendants:

Exhibit A: Attached as **Exhibit A** and incorporated by reference is the Certification of Records and a certified copy of the Wine and Beer Retailer's on Premises Permit issued to Melissa H. McGehee and Kenney J. McGehee, d/b/a Mona's for the subject Establishment from the Texas Alcoholic Beverage Commission and a certified copy of the Texas Limited Sales, Excise, and Use Tax Permit inquiry from the Texas Comptroller of Public Accounts for the subject Establishment (tax number redacted).

Exhibit B: Attached as **Exhibit B** and incorporated by reference is the Affidavit of Joe Hand, Jr., President of Joe Hand Promotions, Inc. Additionally, the Affidavit includes the following exhibits:

3

1. True and correct copies of the Distributorship Agreement and Addendum (redacted) between Plaintiff and the promoter of the UFC Program, providing Plaintiff with the exclusive right to license the exhibition of the UFC Program to commercial establishments such as Defendants' Establishment and the Closed Circuit Television Distribution Agreement (redacted) between Plaintiff and the promoters of the Boxing Program providing Plaintiff with the exclusive right to license the exhibition of the Boxing Program to commercial establishments such as Defendants' Establishment, attached as **Exhibit B(1)** and incorporated by reference;

2. A true and correct copy of the Rate Card for the UFC Program, attached as **Exhibit B(2)** and incorporated by reference;

3. A true and correct copy of the Rate Card for the Boxing Program, attached as **Exhibit B(3)** and incorporated by reference;

4. A true and correct copy of the UFC Piracy Affidavit of Chris Cook ("Plaintiff's Auditor") in connection with the UFC Program, attached as **Exhibit B(4)** and incorporated by reference;

5. A true and correct copy of the Boxing Piracy Affidavit of Chris Cook ("Plaintiff's Auditor") in connection with the Boxing Program, attached as **Exhibit B(5)** and incorporated by reference.

Exhibit C:  Attached as **Exhibit C** and incorporated by reference are true and correct copies of social media posts (Facebook) for Mona's Bar in connection with the Boxing Program noting that one post is thanking everyone "who came out to watch the fight."

Exhibit D:   Attached as **Exhibit D** and incorporated by reference is the Affidavit for Attorney's Fees and Costs.  Additionally, the Affidavit includes the following exhibit:

1. True and correct copies of the service of process invoices for this case, attached as **Exhibit D(1)** and incorporated by reference.

### D.  UNDISPUTED FACTS

10. Pursuant to Plaintiff's Complaint[3] and the evidence presented, the following facts are established as a matter of law by default:

---

[3] By Defendants' default, the Court should accept the well pleaded allegations of facts in the Complaint. *See* e.g., *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200 (5th Cir. 1975).

a. Defendants operated, maintained, and controlled the Establishment on the nights of the Programs. *See* Plaintiff's Complaint, Doc. No. 1 at ¶¶ 2-3 and Exhibit A.

b. Plaintiff is in the business of marketing and licensing commercial exhibitions of pay-per-view prizefight events. *See* Plaintiff's Complaint, Doc. No. 1 at ¶¶ 1, 7-9 and Exhibit B at ¶ 4.

c. Plaintiff possessed the proprietary rights to exhibit and sublicense the right to exhibit the Programs. *See Id.* and Exhibit B(1).

d. Through an agreement with the promoter(s) of the Programs, Plaintiff was licensed to exhibit the Programs at closed circuit locations, such as bars, clubs, restaurants, and other commercial establishments throughout the State of Texas. *See* Plaintiff's Complaint, Doc. No. 1 at ¶¶ 1, 7-9, Exhibit B at ¶ 4, and Exhibit B(1).

e. In Texas, the Programs were legally available to commercial establishments only through an agreement with Plaintiff. *See* Exhibit B at ¶ 4 and Exhibit B(1).

f. In order to safeguard against the unauthorized interception or receipt of the Programs, the interstate satellite transmissions of the Programs were electronically coded or scrambled and were not available to or intended for the use of the general public. If a commercial establishment was authorized by Plaintiff to receive the Programs, Plaintiff authorized the receipt of the signal(s) or authorized the establishment's cable or satellite provider to release the Programs to the establishment, depending upon the establishment's equipment and provider. *See* Plaintiff's Complaint, Doc. No. 1 at ¶¶ 9-12 and Exhibit B at ¶¶ 4-6, 8-9, 12.

g. Authorized commercial establishments which contracted with Plaintiff were required to pay to Plaintiff sublicense fees to receive the Programs. The sublicense fees are based on the capacity of the establishment. Here, the Establishment had an approximate capacity of sixty (60) people. According to the Rate Card for the UFC Program, the fee for a legal broadcast of the UFC Program would have been $1,100.00. According to the Rate Card for the Boxing Program, the fee for a legal broadcast of the Boxing Program would have been $2,200.00. *See* Plaintiff's Complaint, Doc. No. 1 at ¶¶ 9-10, Exhibit B at ¶¶ 8-9, Exhibit B(2), Exhibit B(3), Exhibit B(4), and Exhibit B(5).

h. On the night of the UFC Program, Plaintiff's Auditor, an eye-witness, entered the Mona's establishment located at 318 North Hancock Avenue, Odessa, Texas on November 14, 2015 and observed the UFC Program being broadcast on multiple televisions, counting approximately 63 people in the Establishment at that time. *See* Exhibit B at ¶ 10 and Exhibit B(4).

5

i. On the night of the Boxing Program, Plaintiff's Auditor, an eye-witness, entered the Mona's establishment located at 318 North Hancock Avenue, Odessa, Texas on November 21, 2015 and observed the Boxing Program being broadcast on multiple televisions, counting approximately 52 people in the Establishment at that time. *See* Exhibit B at ¶ 11 and Exhibit B(5).

j. The broadcast of the Boxing Program was advertised and memorialized on social media. *See* Exhibit C.

k. Defendants could not have obtained the transmissions of the Programs had Defendants not undertaken specific wrongful actions to intercept or receive and exhibit the telecast of the Event. *See* Exhibit B at ¶¶ 12-13.

### E. ARGUMENTS & AUTHORITIES

**1. THE COMMUNICATIONS ACT**

11.   The unauthorized interception and broadcast of cable or satellite transmissions violates 47 U.S.C. §§ 553 or 605.  Section 553 covers the interception or receipt of cable communications (communications traveling over cable wire) and Section 605 covers the interception or receipt of radio communications (communications traveling through the air).[4] Accordingly, the unlawful interception or receipt and broadcast of the signals of the Programs are violations of the Federal Communications Act.

12.   "The FCA is a strict liability statute, and the plaintiff is required only to prove the unauthorized exhibition of the intercepted transmission." *See* Cause No. 4:11-cv-01773; *Joe Hand Promotions, Inc. v. Macias* (Memorandum and Order)(S.D. Tex., March 19, 2012)(Atlas, N.)(referencing *KingVision Pay-Per-View, Ltd. v. Lake Alice Bar*, 168 F.3d 347, 349 (9th Cir. 1999)(the finding that bar had, without authorization, shown a preliminary bout required judgment in favor of the plaintiff)).

---

[4] *See J&J Sports Productions, Inc. v. Mandell Family Ventures, L.L.C.*, 751 F.3d 346, 352-53 (5th Cir. 2014).

13. Defendants owned and operated the Establishment; the Programs were exhibited at the Establishment without authorization or payment to Plaintiff, the exclusive holder of the commercial licenses. *See* Plaintiff's Complaint, Doc. No. 1 at ¶¶ 1-3, 7-14, Exhibit A, Exhibit B at ¶¶ 4-11, Exhibit B(1), Exhibit B(2), Exhibit B(3), Exhibit B(4), and Exhibit B(5).

14. In order for an unauthorized commercial establishment to receive broadcasts such as the Programs, there must be some wrongful action, such as using an unauthorized decoder, obtaining cable or satellite service and illegally altering the cable or satellite service to bring the signals of the Programs into the Establishment or moving an unauthorized decoder or satellite card from its authorized location to the Establishment. *See* Exhibit B at ¶¶ 12-13; *See also*, e.g., *KingVision Pay-Per-View, Ltd. v. Jasper Grocery*, 152 F. Supp. 2d 438, 442 (S.D.N.Y. 2001)("In order to access the telecast, it would have been necessary to use an unauthorized decoder, to illegally divert cable service or improperly relocate an authorized decoder" …. "In any of these scenarios, the illegality of the action would have been apparent to the perpetrator"); and *Time Warner Cable v. Googies Luncheonette, Inc.*, 77 F. Supp. 2d 485, 490 (S.D.N.Y. 1999)(when finding willfulness the court stated, "There can be no doubt that the violations were willful and committed for purposes of commercial advantage and private gain. Signals do not descramble spontaneously, nor do television sets connect themselves to cable distribution systems").

15. Defendants' default alone establishes liability as ". . . . conduct on which liability is based may be taken as true as a consequence of the default." *Frame v. S-H, Inc.*, 967 F.2d 194, 205 (5th Cir. 1992)(citations omitted).

16. Given the above, it is clear that Plaintiff has met its burden with respect to liability in this matter.

17. In this Motion, Plaintiff submits evidence to support damages under the Communications Act, specifically seeking damages under 47 U.S.C. § 605.

18. In 1988, in an effort to further deter piracy, Congress amended the Communications Act to provide for more severe penalties for violations. "The Committee wants to give both prosecutors and civil plaintiffs the legal tools they need to bring piracy under control. The Committee commends and encourages inter-industry efforts to deal with piracy, and believes the new remedies and increased penalties adopted through this provision will contribute to these important efforts." *See U.S. v. Scott*, 783 F. Supp. 280, 282 (N.D.Miss. 1992)(referencing 1988 *U.S. Code Cong. & Admin. News* 5577, 5657-58).

2. **STATUTORY DAMAGES UNDER 47 U.S.C. § 605(e)(3)(C)(i)(II)**

19. As its first basis for relief, Plaintiff requests statutory damages pursuant to 47 U.S.C. § 605(e)(3)(C)(i)(II). *See Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829, 850 (11th Cir. 1990).[5]

20. Pursuant to the Communications Act, the amount of statutory damages to which Plaintiff is entitled for <u>each violation</u> shall be not less than $1,000.00 and not more than $10,000.00 under 47 U.S.C. § 605(e)(3)(C)(i)(II). For the reasons set forth herein, Plaintiff seeks statutory damages pursuant to 47 U.S.C. § 605(e)(3)(C)(i)(II) against Defendants in the amount of $10,000.00 for Defendants' violation of the Communications Act in connection with the UFC Program and in the amount of $10,000.00 for Defendants' violation of the Communications Act in connection with the Boxing Program.

---

[5] It is in the Plaintiff's discretion whether to elect to receive actual or statutory damages. *Id. See also*, *Entertainment by J&J, Inc. v. Al-Waha Enterprises, Inc.,* Civil Action No. H-01-2514, 2002 U.S. Dist. LEXIS 16247, at *17 (S.D. Tex. July 24, 2002)("A majority of the courts that have dealt with a violation of both sections of the FCA award damages only under Section 605....")(citations omitted).

21.     Statutory damages are appropriate where actual damages are difficult to prove. *See Lauratex Textile Corp. v. Allton Knitting Mills, Inc.,* 519 F. Supp. 730, 732 (S.D.N.Y. 1981); *Lottie Joplin Thomas Trust v. Crown Publishers, Inc.,* 592 F.2d 651, 657 (2d Cir. 1978). The lack of adequate proof of any particular element causes the Court to rely, within its discretion, on the statutory limitations. *See F.W. Woolworth Co. v. Contemporary Arts, Inc.,* 344 U.S. 228, 233 (1952).

22.     As stated above, and supported by the evidence attached hereto, on the dates of the Programs, Defendants intercepted or received or assisted in the interception or receipt of the live telecasts of the Programs and broadcasted or assisted in the broadcast of the Programs to the patrons at Defendants' Establishment without paying the sublicense fees to Plaintiff. *See* Doc. No. 1 at ¶¶ 1-3, 7-14, Exhibit A, Exhibit B, Exhibit B(1), Exhibit B(2), Exhibit B(3), Exhibit B(4), and Exhibit B(5).

23.     In the instant case, as more fully discussed below, it would be impossible to determine the full extent of the profits lost by Plaintiff and the additional damages sustained by Plaintiff as a result of Defendants' unlawful actions. Accordingly, Plaintiff elects to receive statutory damages.

24.     Because the statute defining statutory damage awards for violations of the Copyright Act of 1976, 17 U.S.C. § 101 et seq. (the "Copyright Act") is analogous to the Communications Act,[6] its case law is influential in analyzing the amount of statutory damages to

---

[6] 17 U.S.C. § 504(c)(1) provides as follows:
Statutory damages. (1) Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just.

which Plaintiff is entitled.[7]

25. Applying the courts' analysis from their decisions under the Copyright Act, the lost income from the sale of the Programs to Defendants' Establishment represents only a starting place for the determination of the amount of damages to which Plaintiff is entitled as a result of Defendants' wrongful acts.[8] The sublicense fees for the Programs which Plaintiff charges to an authorized commercial establishment is based upon the capacity of the commercial establishment. For an establishment with a capacity of 60 people, the sublicense fee for the UFC Program would have been $1,100.00 and the sublicense fee for the Boxing Program would have been $2,200.00. *See* Exhibit B at ¶¶ 8-9, Exhibit B(2), and Exhibit B(3).

26. Factors to consider in determining a statutory damage award include: (1) the "fair market value of the rights infringed", (2) the "revenue lost by the plaintiff and profits gained by the defendant," (3) "the infringer's state of mind" and (4) "deterrence of future infringement." *See Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1544 (S.D.N.Y. 1991).

---

[7]According to the United States Supreme Court, when determining the applicable statutory damage award under the Copyright Act, the amount of profits lost by the copyright holder is not the only criteria for a Court to consider. *Woolworth*, 344 U.S. at 233. Rather, "a rule of liability which merely takes away the profits from an infringement would offer little discouragement to infringers. It would fall short of an effective sanction for enforcement of the copyright policy. The statutory rule, formulated after long experience, not merely compels restitution of profit and reparation for injury but also is designed to discourage wrongful conduct. The discretion of the court is wide enough to permit a resort to statutory damages for such purposes. Even for uninjurious and unprofitable invasions of copyright the court may, if it deems it just, impose a liability within statutory limits to sanction and vindicate the statutory policy". *Id*. at 233.

[8] See, e.g., *Entertainment by J&J, Inc. v. Al-Waha Enterprises, Inc*., 219 F. Supp. 2d 769, 776 (S.D. Tex. 2002) ("Merely requiring Al-Waha to pay the price it would have been charged to obtain legal authorization to display the Event does nothing to accomplish this objective of the statute. There would be no incentive to cease the violation if the penalty were merely the amount that should have been paid.")(citations omitted).

27. Congress emphasized that these incidents threaten to undermine the satellite industry and adversely impact legitimate satellite dealers and satellite programmers who otherwise would be receiving payment for their programming or descrambling devices. *See Scott*, 783 F. Supp. 280, 281 (referencing 1988 U.S. Code Cong. & Admin. News 5577, 5642-43). Significantly, there are no countervailing social or policy considerations which justify the unauthorized interception of these broadcasts. *See ON/TV of Chicago v. Julien*, 763 F.2d 839, 843 (7th Cir. 1985); and *Subscription Television of Greater Washington v. Kaufman*, 606 F. Supp. 1540, 1544 (D.D.C. 1985).

28. Plaintiff should receive additional compensation as it has been deprived of the "value, benefits and profits derived" from the unauthorized broadcasts of the Programs to Defendants' Establishment and its patrons as well as the value of "business investment, business opportunities, reputation, and goodwill," in addition to the lost revenue which would have been derived from the delivery and exhibition of the Programs to Defendants' Establishment and its patrons. *See American Television and Communications Corp. v. Floken, Ltd.*, 629 F. Supp. 1462, 1466 (M.D. Fla. 1986).

29. Types of damages suffered by Plaintiff and factors related to same include the following:

   a. Plaintiff loses customers, which are unwilling and financially unable to compete with those unauthorized commercial establishments, which steal sports and other closed-circuit programming.

   b. Because some unauthorized commercial establishments offer the stolen programming to their patrons for no fee or for a fee which is less than the authorized establishments, the legitimate commercial establishments with the right to broadcast closed-circuit programming attract less customers. As a result, the authorized commercial establishments fail to recover the sublicense fees paid, suffer the loss of patrons, and/or incur financial loss.

    c. When the unauthorized commercial establishment advertises the availability of the stolen programming, the number of patrons at the unauthorized commercial establishment likely increases and, as a result, Plaintiff and the authorized commercial establishments suffer additional losses.

    d. Theft of closed-circuit broadcasts, such as the Programs, by unauthorized commercial establishments, such as Defendants' Establishment, adversely affects both Plaintiff and its customers. Plaintiff pays substantial fees to obtain the right to sublicense the broadcast of closed-circuit programming to authorized commercial establishments. Plaintiff's primary source of revenue is the sublicense fees which it charges to authorized commercial establishments for the right to broadcast closed-circuit sports and entertainment programming such as the Programs.

*See* Exhibit B at ¶¶ 5, 14-16.

30.    Each visitor of Defendants' Establishment is lost as a future patron of authorized broadcasts. *See Cox Cable Cleveland Area, Inc. v. King*, 582 F. Supp. 376, 381 (E.D. Ohio 1983). Plaintiff suffers ongoing loss to its goodwill and reputation and loss of its right and ability to control and receive payment for the transmissions, because patrons viewing the pirated Programs at Defendants' Establishment would have become patrons of an authorized establishment thereby increasing the value of the Programs and Plaintiff's business opportunities. S*ee* Exhibit B at ¶¶ 5, 14-16; *see also Quincy Cablesystems, Inc. v. Sully's Bar, Inc.*, 640 F. Supp. 1159, 1161 (D. Ma. 1986).

31.    After experiencing serious erosion in sales of its proprietary programming to Plaintiff's commercial customers resulting from rampant piracy of Plaintiff's broadcasts, Plaintiff took affirmative action to protect its proprietary programming. *See* Exhibit B at ¶¶ 5-6. Domestic commercial establishments were required to pay Plaintiff a commercial sublicense fee to broadcast the Programs. *See* Exhibit B at ¶¶ 8-9. The detrimental effects of signal piracy include the loss of revenue to Plaintiff, the increased costs to those lawful residential and commercial customers of

cable and satellite broadcasting, and the loss of tax revenue to the communities where Plaintiff's potential customers reside. *See* Exhibit B at ¶¶ 14-16.

32. Therefore, when an unauthorized commercial establishment intercepts or receives and broadcasts closed-circuit programming, such as the Programs, Plaintiff's reputation and goodwill suffer from what is perceived as a lack of consequence. *See* Exhibit B at ¶¶ 14-16. An incalculable element of damages is the ill-will and possible loss of future business from legitimate commercial establishments which refuse to pay sublicense fees because they cannot compete with unauthorized commercial establishments which steal closed-circuit programming, such as the Programs. *See Id.*

33. The continued viability of Plaintiff's business relies upon the willingness and ability of commercial establishments to pay sublicense fees for the right to broadcast closed-circuit sports and entertainment programming, such as the Programs. *See* Exhibit B at ¶¶ 4-5, 14-16.

34. Given the benefits which Defendants received from the broadcasts of the Programs and the types of damages Plaintiff suffered, it is fair and reasonable to assess against Defendants and award to Plaintiff (1) statutory damages in the amount of $10,000.00 for the UFC Program and (2) statutory damages in the amount of $10,000.00 for the Boxing Program.

    **3.**    **DAMAGES FOR WILLFUL ACT UNDER 47 U.S.C. § 605(e)(3)(C)(ii)**

35. Plaintiff also requests damages pursuant to 47 U.S.C. § 605(e)(3)(C)(ii) in light of Defendants' actions being willful and "for purposes of direct or indirect commercial advantage or private financial gain." In *ON/TV of Chicago v. Julien*, 763 F.2d 839, 844 (7th Cir. 1985), the Court of Appeals for the Seventh Circuit interpreted willful under the statute as "disregard for the governing statute and an indifference to its requirements." *Id.* at 844 (quoting *TransWorld Airlines,*

*Inc. v. Thurston*, 469 U.S. 111, 127 (1985)).

36. Defendants specifically and willfully acted to illegally intercept the transmissions of the Programs for Defendants' commercial advantage, because Defendants could not have "innocently" accessed the broadcasts of the Programs.[9] *See* Exhibit A and Exhibit B at ¶¶ 12-13.

37. Simply, the complexity of intercepting transmissions makes it impossible to mistakenly or "innocently" access the broadcasts of the Programs. Defendants knew it was wrong to receive, intercept, and divert the signals of the Programs and to broadcast them in Defendants' commercial establishment. *See KingVision Pay-Per-View, Ltd. v. Jasper Grocery*, 152 F. Supp. 2d 438, 442 (S.D.N.Y. 2001); *see also Time Warner Cable v. Googies Luncheonette, Inc.*, 77 F. Supp. 2d 485, 490 (S.D.N.Y. 1999)(when finding willfulness the court stated, "there can be no doubt that the violations were willful and committed for purposes of commercial advantage and private gain. *Signals do not descramble spontaneously, nor do television sets connect themselves to cable distribution systems*". (emphasis added). *See also KingVision Pay-Per-View, Ltd. v. Valles*, EP-CA-179-DB, 2001 U.S. Dist. LEXIS 24268, at *9 (W.D. Tex. March 30, 2001)(Briones, D.) ("While Defendants may not have been well-versed in the statutory restrictions on the unauthorized interception of satellite transmissions, the Court finds that *there must have been some knowledge on the part of Defendants* that such interception could not be had for free.")(emphasis added).

---

[9] *See Joe Hand Promotions, Inc. v. Malespin*, 2001 U.S. Dist. LEXIS 2037, at *9-10 (S.D.N.Y. Feb. 27, 2001) (Nathaniel, K.)("The respective defendants elected not to enter into contracts with plaintiff to obtain the transmission of the Program. Their only means of obtaining the Program, and to avoid paying the legal subscription rate for a commercial establishment, would be: (a) using an illegal descrambler in a satellite receiver; (b) using a pirate cable box; (c) registering their respective commercial establishments as residential sites rather than commercial; and (d) ordering the Program for their respective residences and moving their residential cable boxes to their commercial establishments. The Court finds that employing ***any one*** of these means to defraud plaintiff would be evidence of willfulness and would support an award of enhanced damages.")(emphasis added).

38.     Defendants' purpose and intent in exhibiting the Programs was to secure a private financial gain and direct commercial advantage by pirating Plaintiff's licensed exhibitions and infringing upon Plaintiff's rights while avoiding proper payment to Plaintiff as shown in the following evidence: [10]

   a.   Plaintiff presents this Court with evidence of multiple violations as this case seeks damages for the piracy of two (2) of Plaintiff's broadcasts.  *See* Complaint, Doc. No. 1, Exhibit B, and Exhibits B(1) – B(5).

   b.   The Boxing Program was advertised on Mona's Bar's social media.  *See* Exhibit C.

   c.   Plaintiff's Auditor counted approximately 63 people at the Establishment on the night of the UFC Program.  *See* Exhibit B(4).

   d.   Plaintiff's Auditor counted approximately 52 people at the Establishment on the night of the Boxing Program.  *See* Exhibit B(5).

   e.   The Establishment is a business that sold alcohol on the nights of the Programs.  *See* Exhibit A, Exhibit B(4), and Exhibit B(5).

   f.   Patrons who entered the commercial Establishment viewed the pirated Programs on multiple televisions.  *See* Exhibit B(4) and Exhibit B(5).

   g.   Mona's Bar's social media thanked everyone for coming out to watch the fight.  *See* Exhibit C.

39.     Clearly, Defendants' actions were willful and for a commercial advantage warranting additional damages under the Communications Act.

---

[10] *See J&J Sports Productions, Inc. v. Papagallos 1, Inc.*, Civil Action No. A-08-CA-691-SS (W.D. Tex. April 17, 2009)(Sparks, S.) Order (Doc. No. 13)("The undisputed evidence establishes the Event was broadcast to paying customers of Defendant's commercial establishment and thus the violation was for commercial advantage or private gain.").

40.     Generally, it is reasonable to increase an actual or statutory damages award by a specific percentage to penalize Defendants for willful acts.[11] Plaintiff requests that this Court hold Defendants accountable for a substantial amount; otherwise, other commercial establishments "would be encouraged to violate the law knowing the full extent of their liability would not exceed what they would have to pay for a license on the open market." *See Fallici v. New Gazette Literary Corp.*, 568 F. Supp. 1172, 1174 (S.D.N.Y. 1983). The award of additional damages should be significant to deter Defendants and other unauthorized commercial establishments from stealing protected communications.

41.     Therefore, pursuant to Section 605(e)(3)(C)(ii), in addition to the reasons set forth above, the minimum amount of Fifty Thousand Dollars ($50,000.00)(or five times (5) the amount of statutory damages, if $10,000.00 in statutory damages awarded) should be awarded to Plaintiff for <u>each</u> of the two (2) violations. The following authority also supports an award of additional damages:

a. To deter future pirating of cable and satellite broadcasts. *See*, e.g., *KingVision Pay-Per-View, Ltd. v. Scott E.'s Pub, Inc.*, 146 F. Supp. 2d 955, 959-60 (E.D. Wis. 2001) (discussing multipliers of three to eight (3 to 8) times the statutory damages as additional damages in order to deter future communication theft).

b. To deter actions involving theft, fraud and conversion. *See Entertainment by J&J, Inc. v. Tia Maria Mexican Restaurant & Cantina, Inc.*, 97 F. Supp. 2d 775, 778-779 (S.D. Tex. 2000)(Gilmore, V.)("[a] suit for illegal reception and broadcast of a cable signal implicates several areas of the law [including fraud and theft]."); and *ProStar v. Massachi*, 239 F.3d 669, 675 (5th Cir. 2001)(analogizes violation under Communications Act to conversion).

---

[11] *See* e.g., *Lauratex*, 519 F. Supp. at 733 (increase of seven times the actual damages for willful acts); *Cable/Home*, 902 F.2d 829 (additional damages of five times actual damages for willful conduct); and *Entertainment by J&J, Inc.*, 219 F. Supp. 2d at 777 (S.D. Tex. 2002)(the court awarded three times statutory damages for willful violations).

## F. ATTORNEY'S FEES

42. Plaintiff requests an award of attorney's fees and costs pursuant to Section 605(e)(3)(B)(iii). Under Section 605(e)(3)(B)(iii), the award of attorney's fees is mandatory. According to Section 605(e)(3)(B)(iii), "[t]he Court... shall direct the recovery of full costs, including awarding reasonable attorneys' fees..."

43. Plaintiff seeks an attorney's fees award for the prosecution of this action through the final default judgment requested. *See* Exhibit D. In addition, Plaintiff seeks an award of costs, which costs have been proven by affidavit with the attached service of process invoices. *See* Exhibit D at ¶ 9 and Exhibit D(1).

## G. CONCLUSION

44. In conclusion, the averments that Defendants, willfully and with the purpose and intent to secure a commercial advantage and private financial gain, illegally intercepted or received the closed-circuit telecasts of the Programs; and that Defendants exhibited the Programs in Defendants' commercial Establishment without authorization and without paying the sublicensing fees to Plaintiff are deemed admitted and supported by evidence. *See* Plaintiff's Complaint, Doc. No. 1 and the accompanying exhibits.

45. Accordingly, pursuant to the Communications Act and the statutory damages permitted thereunder, Plaintiff seeks the entry of a final default judgment in favor of Plaintiff and against Defendants for the relief sought in this Motion.

## H.  PRAYER

Plaintiff respectfully requests that the Court sign and cause to be entered a final default judgment in favor of Plaintiff, JOE HAND PROMOTIONS, INC., and against Defendants, (1) MELISSA H. MCGEHEE, a/k/a MELISSA HERNANDEZ, d/b/a MONA'S and (2) KENNEY J. MCGEHEE, a/k/a KENNY J. MCGEHEE, d/b/a MONA'S, jointly and severally, awarding Plaintiff:

(1)     Statutory damages pursuant to 47 U.S.C. § 605(e)(3)(C)(i)(II) from Defendants, jointly and severally, in the amount of $10,000.00 for the UFC Program;

(2)     Statutory damages pursuant to 47 U.S.C. § 605(e)(3)(C)(i)(II) from Defendants, jointly and severally, in the amount of $10,000.00 for the Boxing Program;

(3)     Additional damages pursuant to 47 U.S.C. § 605(e)(3)(C)(ii) from Defendants, jointly and severally, in the amount of $50,000.00 for the UFC Program;

(4)     Additional damages pursuant to 47 U.S.C. § 605(e)(3)(C)(ii) from Defendants, jointly and severally, in the amount of $50,000.00 for the Boxing Program;

(5)     Attorney's fees from Defendants, jointly and severally, in the amount of the hourly time presented in the Affidavit for Attorney's Fees and Costs (for prosecution of this case through the final default judgment); along with attorney's fees for post-trial or appellate services;

(6)     Costs in the amount of $550.00 from Defendants, jointly and severally;

(7)     Post-judgment interest at the highest lawful rate; and

(8)     Such other and further relief to which Plaintiff is entitled.

Respectfully submitted,

JAMIE KING, P.C.

*/s/ Jamie King*
Jamie King
Attorney-in-Charge
State Bar No. 24043755
P.O. Box 5757
Kingwood, Texas 77325
(832) 584-0106 Telephone
(888) 247-0443 Facsimile
Jamie@jamiekingpc.com

ATTORNEY FOR PLAINTIFF,
JOE HAND PROMOTIONS, INC.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 20th day of December, 2017, true and correct copies of the foregoing and the exhibits were served as follows:

*Via U.S. Mail, Postage Prepaid and Certified Mail, Return Receipt Requested upon*:

| Melissa H. McGehee, a/k/a Melissa Hernandez, d/b/a Mona's 1302 E. 35th Street Odessa, Texas 79762 | Kenney J. McGehee, a/k/a Kenny J. McGehee, d/b/a Mona's 1302 E. 35th Street Odessa, Texas 79762 |
|---|---|

*/s/ Jamie King*                                    12/20/2017
Jamie King                                          Date

19